# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

DOUGLAS MOUSER,                              1:05 cv 0903 OWW WMW HC

                Petitioner,          FINDINGS AND RECOMMENDATIONS RE
                                               PETITION FOR WRIT OF HABEAS CORPUS

     v.

JEANNE S. WOODFORD, Warden,

                Respondent.
_____/

Petitioner is a prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. Section 2254.  Respondent opposes the petition.

## PROCEDURAL HISTORY

A jury in Stanislaus County Superior Court convicted Petitioner of second degree murder. The trial court sentenced Petitioner to serve a term of fifteen years to life in state prison.    Petitioner filed a direct appeal with the California Court of Appeal, Fifth Appellate District, which affirmed the judgment on January 26, 2004.  Petitioner filed a petition for review with the California Supreme Court, which the court denied on May 12, 2004.

This case proceeds on the amended petition filed December 20, 2005.  Respondent admits

1  that Petitioner has exhausted his state judicial remedies.

2                                      **LEGAL STANDARDS**

3  JURISDICTION

4          Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant

5  to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of

6  the United States.  28 U.S.C. § 2254(a);  28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 120 S.Ct.

7  1495, 1504 fn.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by

8  the United States Constitution.  In addition, the conviction challenged arises out of the Stanislaus

9  County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a);

10 2241(d).  Accordingly, the court has jurisdiction over the action.

11         On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

12 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

13 Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct.

14 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (quoting Drinkard v. Johnson, 97

15 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other*

16 *grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable

17 to cases filed after statute's enactment).  The instant petition was filed after the enactment of the

18 AEDPA, thus it is governed by its provisions.

19 STANDARD OF REVIEW

20         This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody

21 pursuant to the judgment of a State court only on the ground that he is in custody in violation of the

22 Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

23         The AEDPA altered the standard of review that a federal habeas court must apply with

24 respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v.

25 Taylor, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus will

26 not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or

27 involved an unreasonable application of, clearly established Federal law, as determined by the

28 Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable

1   determination of the facts in light of the evidence presented in the State Court proceeding." 28

2   U.S.C. § 2254(d); <u>Lockyer v. Andrade</u>, 123 S.Ct. 1166, 1173 (2003) (disapproving of the Ninth

3   Circuit's approach in <u>Van Tran v. Lindsey</u>, 212 F.3d 1143 (9th Cir. 2000)); <u>Williams v. Taylor</u>, 120

4   S.Ct. 1495, 1523 (2000).  "A federal habeas court may not issue the writ simply because that court

5   concludes in its independent judgment that the relevant state-court decision applied clearly

6   established federal law erroneously or incorrectly."  <u>Lockyer</u>, at 1174 (citations omitted).  "Rather,

7   that application must be objectively unreasonable."  <u>Id.</u> (citations omitted).

8        When, as here, the California Supreme Court's opinion is summary in nature, this court

9   "looks through" that decision and presumes it adopted the reasoning of the California Court of

10  Appeal, the last state court to have issued a reasoned opinion. <u>See Ylst v. Nunnemaker</u>, 501 U.S.

11  797, 804-05 & n. 3, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (establishing, on habeas review, "look

12  through" presumption that higher court agrees with lower court's reasoning where former affirms

13  latter without discussion); <u>see also</u> <u>LaJoie v. Thompson</u>, 217 F.3d 663, 669 n. 7 (9th Cir.2000)

14  (holding federal courts look to last reasoned state court opinion in determining whether state court's

15  rejection of petitioner's claims was contrary to or an unreasonable application of federal law under §

16  2254(d)(1)).

17       While habeas corpus relief is an important instrument to assure that individuals are

18  constitutionally protected, <u>Barefoot v. Estelle</u>, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983);

19  <u>Harris v. Nelson</u>, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal

20  conviction is the primary method for a petitioner to challenge that conviction.  <u>Brecht v.</u>

21  <u>Abrahamson</u>, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's factual

22  determinations must be presumed correct, and the federal court must accept all factual findings made

23  by the state court unless the petitioner can rebut "the presumption of correctness by clear and

24  convincing evidence."  28 U.S.C. § 2254(e)(1); <u>Purkett v. Elem</u>, 514 U.S. 765, 115 S.Ct. 1769

25  (1995); <u>Thompson v. Keohane</u>, 516 U.S. 99, 116 S.Ct. 457 (1995); <u>Langford v. Day</u>, 110 F.3d 1380,

26  1388 (9th Cir. 1997).

27                              **FACTUAL BACKGROUND**

28       The court finds the Court of Appeal correctly summarized the facts in its  January 26, 2004

1   opinion.  Thus, the court adopts the factual recitations set forth by the California Court of Appeal.

2                    **DISCUSSION**

3   I.  Jury Instruction on Second Degree Felony Murder

4         Petitioner contends that the trial court committed reversible error by instructing the jury on a

5   theory of second degree felony murder which does not exist under California law.  Specifically,

6   Petitioner claims that the trial court erred in instructing the jury pursuant to CALJIC 8.51, by reading

7   the following instruction:

8             If a person causes another's death while committing a felony which is dangerous to human
               life, the crime is murder.  If a person causes another's death while committing a
9             misdemeanor or infraction which is dangerous to human life under the circumstances of the
               commission, the crime is involuntary manslaughter.
10            There are many acts which are lawful but nevertheless endanger human life.  If a person
              causes another death by doing an act or engaging in conduct in a criminally negligent
11           manner, without realizing the risk involved, he is guilty of involuntary manslaughter.  If, on
             the other hand, the person realized the risk and act in total disregard of the danger to life
12           involved, malice is implied, and [the] crime is murder.

13

14         A challenge to a jury instruction solely as an error under state law does not state a claim

15   cognizable in a federal habeas corpus action.  See, Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).

16   To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing

17   instruction by itself so infected the entire trial that the resulting conviction violates due process.  See,

18   id. at 72.  Additionally, the instruction may not be judged in artificial isolation, but must be

19   considered in the context of the instructions as a whole and the trial record. Id.  The court must

20   evaluate jury instructions in the context of the overall charge to the jury as a component of the entire

21   trial process. See, United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v, Kibbe,  431

22   U.S. 145, 154 (1977)).  Furthermore, even if it is determined that the instruction violated the

23   petitioner's right to due process, a petitioner can only obtain relief if the unconstitutional instruction

24   had a substantial influence on the conviction and thereby resulted in actual prejudice under Brecht v.

25   Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710 (1993) (whether the error had a substantial and

26   injurious effect or influence in determining the jury's verdict.). See, Hanna v. Riveland, 87 F.3d

27   1034, 1039 (9th Cir. 1996).  The burden of demonstrating that an erroneous instruction was so

28   prejudicial that it will support a collateral attack on the constitutional validity of a state court's

1    judgment is even greater than the showing required to establish plain error on direct appeal."  Id.

2           The California Court of Appeal rejected Petitioner's claim, explaining as follows:

3           During an instructional conference, defense counsel stated, "my client does not wish to
     have [instruction on] the lesser included offense of voluntary or involuntary manslaughter."
4    The People responded that instruction on voluntary manslaughter was appropriate because
     there was some circumstantial evidence that the killing may have resulted from a sudden
5    quarrel between defendant and Genna.  The court ruled that the jury would be instructed on
     both voluntary and involuntary manslaughter.  It commented that the killing could be
6    mitigated from murder down to manslaughter because "[t]his case could arguably involve an
     assault.  That could be one of the theories that could be argued by either side.

7           The topic of second degree felony murder was not referenced during closing arguments.
     The prosecutor did not argue that defendant could be found guilty of second degree murder
8    because Genna died during the commission of a felony assault by strangulation or another
     underlying felony such as child abuse.  Rather, the prosecutor argued that if the murder was
9    second degree, then it was either an intentional killing or it was an implied malice murder.
     Even if defendant only intended to "vent frustration" or make Genna "be quiet," when he
10   wrapped a ligature around her throat and strangled her past the point of unconsciousness,
     "there can be no question that all that's a conscious disregard for the danger involved."

11          Second degree murder instructions were given based upon theories of unpremeditated
     murder and a killing resulting from an act dangerous to life.  The court instructed on express
12   and implied malice.  (CALJIC Nos. 8.30, 8.31.)  The court did not instruct on the felony-
     murder doctrine (CALJIC 8.32) or mention the crimes of assault or child abuse.  However,
13   the court included CALJIC No. 8.51 among its manslaughter instructions.  The title of this
     instruction state that it distinguishes murder and manslaughter.  In relevant part, the first
14   paragraph of this instruction provides, "If a person causes another's death, while committing
     a felony which is dangerous to human life, the crime is murder.  If a person causes another's
15   death while committing a misdemeanor or infraction which is dangerous to human life under
     the circumstances of its commission, the crime is involuntary manslaughter."

16          The Use Note to CALJIC 8.51 states, "[t]his instruction should not be given in a second
     degree felony-murder prosecution in which the felony has merged into the homicide," citing
17   *People v. Hansen* (1994) 9 Cal.4th 300.  (CALJIC No. 8.51 (7th ed. 2003) pp. 376-377.)  In
     *Hansen*, our Supreme Court reaffirmed the viability of the "*Ireland* rule" (*People v. Ireland*
18   (1969) 70 Cal.2d 522, 538-539), which prohibits an assaultive crime from serving as the
     predicate felony in second degree felony-murder prosecutions; the assault merges into the
19   homicide.  (*Hansen, supra*, 9 Cal.4th at pp. 311-316.)

            Defendant contends that inclusion of CALJIC No. 8.51 in the jury charge violated the
20   *Ireland* rule by "permitt[ing] the jury, upon finding that [defendant's] efforts at discipline
     escalated into a felonious assault, to convict him of second degree murder rather than
21   involuntary manslaughter simply because Genna died from that assault, thereby 'reliev[ing]
     the prosecution  .  .  . of the burden of having to prove malice in order to obtain a murder
22   conviction.'"

            Given the facts of this case, we agree that *if* the jury had been instructed on felony
23   murder as a theory supporting a second degree murder verdict, *Ireland* error would have
     occurred because the only predicate felonies suggested by the evidence are assault and child
24   abuse and case law has clearly established that these felonies merge into homicide.  (*People
     v. Cobas* (1970) 12 Cal.App.3d 952, 954-955 [fatal assault by strangulation merged into
25   homicide]; *People v. Stewart* (2000) 77 Cal.App.4th 785, 797-798 [no duty to instruct on
     felony-murder theory where death resulted from child abuse].)  Yet, in this case the jury was
26   not instructed on felony murder as a theory supporting a second degree murder verdict and
     the People did not pursue this legal theory.  Thus, we are confronted with a different issue:
27   does a single, tangential reference in one instruction to an undefined "felony" impermissibly
     inform the jury that it may convict defendant of second degree murder without finding that he
28   had acted with malice?  We answer this question in the negative:

*People v. Cisneros* (1973) 35 Cal.App.3d 399 (*Cisneros*) is directly on point. Appellant was convicted of second degree murder after he ended an argument with the victim by fatally shooting him. In relevant part, the court instructed: "*If a person while committing a felony causes another's death, malice is implied,* and the crime is murder. If while committing a misdemeanor he causes another's death, there is no malice, and he is guilty only of manslaughter.'" (*Id.* at p. 432.) Cisneros raised the exact contention that is asserted by defendant here, arguing that the reference to the implication of malice from the commission of a felony violated the *Ireland* rule because it "permitted the jurors to find the malice requisite for first or second degree murder even though the fatal shot was fired without the actual malicious intent to kill." (*Ibid*.) This argument was decisively rejected, as follows:

> "In this case the references to felony second degree murder were only tangential. There was no instruction directing the jury's attention to a particular felony, such as assault with a deadly weapon or any other felony which might either be an offense which was an integral part of the homicide, or which, although a felony, was not in the abstract inherently dangerous to human life. It is concluded that in viewing the instructions as a whole, the jurors were not relieved of the necessity of making a specific finding of malice aforethought before returning a verdict of second degree murder."
> (*Cisneros,supra*, 34 Cal.App.3d at p. 433.)

We agree with the reasoning expressed in *Cisneros* and likewise conclude that the single reference to felonies in CALJIC No. 8.51 is insufficient by itself to lead reasonable jurors to conclude that they were not required to find either express or implied malice in order to convict defendant of murder. It is axiomatic that the jury charge must be considered as a whole. (*Cisneros, supra*, 34 Cal.App.3d at p. 433.) Here, standard instructions were given informing the jury that in order to convict defendant of murder it must conclude that he had acted with malice. Both express and implied malice were defined. The jury also was instructed pursuant to CALJIC No. 8.31 that in order to find defendant guilty of second degree murder because he intentionally committed a dangerous act, it must find that "[t]he act was deliberately performed with knowledge of the danger to, and the conscious disregard for, human life." The jury was not given CALJIC No. 8.32, which explains the felony-murder doctrine. No specific predicate felony such as assault or child abuse was referenced in the jury charge. The prosecutor did not argue that defendant could be convicted of murder solely because Genna died during the commission of a felony, he did not highlight the challenged instruction, or otherwise mention assault or child abuse. The jury was not present when the trial court referenced the crime of assault during a conference with counsel. For all these reasons, we find that the charge as a whole did not relieve the jury of its obligation to find that defendant acted with malice before returning a second degree murder verdict; no juror could have found defendant guilty of second degree murder solely because of defendant's commission of a merged felony. We therefore reject defendant's claim of *Ireland* error.

[Footnote 9] Even if we had found that inclusion of CALJIC No. 8.51 in the jury charge violated the *Ireland* rule (see *People v. Berry* (1976) 18 Cal.3d 509, 518, fn. 4), these factors also demonstrate that the resulting error was harmless beyond a reasonable doubt because no juror could have found defendant guilty of second degree murder solely because the death resulted from a merged felony. Published cases reversing murder convictions because of *Ireland* error involve situations where the jury was instructed on the felony-murder doctrine and the predicate felony was defined for them. (See, e.g., *People v. Cobas, supra,* 12 Cal.App.3d at p. 954; *People v. Smith, supra,* 35 Cal.3d at pp. 802-803.)

In arguing the trial court erred, Petitioner relies on <u>Suniga v. Bunnell</u>, 998 F.2d 664 (9th Cir. 1993), in which the court held that instructing the jury on the non-existent theory of felony-murder

1   during an assault with a deadly weapon was constitutional error.  As Respondent argues, however,

2   Suniga is distinguishable because in that case, the trial court did not just make a tangential reference,

3   but actually instructed the jury on the theory of felony-murder and instructed the jury that an assault

4   with a deadly weapon is a felony inherently dangerous to human life.  Suniga, 998 F.2d at 666.

5        There has also been a significant change in the legal landscape since Suniga was decided.  In

6   that case, the Ninth Circuit recognized that the Court of Appeal had found the instructional error

7   harmless beyond a reasonable doubt, but held that it was not bound by the determination because of

8   de novo review.  Because Suniga was decided prior the enactment of the AEDPA, it was not required

9   to give deference to the Court of Appeal's decision.  Such is no longer the case.

10       After reviewing the parties' arguments and the decision of the Court of Appeal, this court

11  finds that Petitioner cannot carry his burden of demonstrating that the state court's adjudication of

12  the claim "resulted in a decision that was contrary to, or involved an unreasonable application of,

13  clearly established Federal law, as determined by the Supreme Court of the United States;" or

14  "resulted in a decision that was based on an unreasonable determination of the facts in light of the

15  evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d).  The court notes in

16  particular that under controlling Supreme Court authority, a challenged jury instruction may not be

17  judged in artificial isolation, but must be considered in the context of the instructions as a whole and

18  the trial record .  See, Estelle 502 U.S. at 72.  This was done effectively by the Court of Appeal, and

19  this court does not find a due process violation here such as would support habeas relief.  This claim

20  therefore provides no basis for habeas corpus relief.

21  II.  Jury Instruction on Voluntary Manslaughter

22       Petitioner contends that the trial court erred when it instructed the jury that a required element

23  of voluntary manslaughter is the intent to kill.  Petitioner argues that this erroneous instruction

24  precluded the jury from considering the defense of heat of passion.

25       In addressing this second jury instruction issue, the Court of Appeal held as follows:

26       The trial court gave the standard instruction on voluntary manslaughter, including former
         CALJIC No. 8.40.  At that time, the instruction stated that one of the elements of voluntary
27       manslaughter is that "[t]he killing was done with the intent to kill."  During the pendency of
         this appeal, our Supreme Court decided Lasko, supra, 23 Cal.4th 101, which held, in relevant
28       part, that former CALJIC 8.40 was legally incorrect because "intent to kill is not a necessary

element of the crime of voluntary manslaughter, which is a lesser offense included in the crime of murder." (*Id.* at p. 111.)  The high court explained: "[A] killer who acts in a sudden quarrel or heat of passion lacks malice and is therefore not guilty of murder, irrespective of the presence or absence of an intent to kill.  Just as an unlawful killing *with* malice is murder regardless of whether there was an intent to kill, an unlawful killing without malice (because of a sudden quarrel or heat of passion) is voluntary manslaughter, regardless of whether there was an intent to kill." (*Id.* at pp. 109-110.)  Citing *Lasko*, defendant asserts that the jury was prejudicially misinstructed in this regard. [Footnote 10.  *People v. Crowe* (2001) 87 Cal.App.4th 86, 95 held that *Lasko* did not establish a new rule of law and could be applied retroactively.]  The Attorney General concedes the error but argues that there was no resulting prejudice.  We agree with the Attorney General.

In *Lasko, supra,* 23 Cal.4th 101 at pages 111 to 113, the high court found the erroneous instruction harmless under the state law standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 based on two factors.  First, the jury had also been given CALJIC No. 8.50, which correctly informed the jury that in order to convict defendant of murder and not manslaughter the People must prove that the act which caused the death was not done in the heat of passion or upon a sudden quarrel.  The court reasoned that if the jury believed defendant had "unintentionally killed [the victim] in the heat of passion, it would have concluded that it could not convict defendant of murder (because he killed in the heat of passion) and could not convict Defendant of voluntary manslaughter (because he lacked the intent to kill).  The jury most likely would have convicted defendant of involuntary manslaughter, a lesser offense included within the crime of murder, on which the jury was also instructed.  Instead, the jury convicted defendant of second degree murder, showing that it did not believe the killing was committed in the heat of passion." (*Id.* at p. 112.)  Second, the subject of voluntary manslaughter had not figured prominently in closing arguments and the evidence strongly suggested an intent to kill.  Therefore, "[u]nder the circumstances, it is not reasonably probable that a properly instructed jury would have convicted defendant of the lesser included offense of voluntary manslaughter." (*Id.* at p. 113.)

The court also rejected Lasko's assertion that the erroneous instruction had violated his federal constitutional rights to trial by jury and to due process of law.  It explained that when the jury charge is considered as a whole, it does not support the position that the erroneous instruction "could have led the jury to consider that if he lacked the intent to kill, it had to find him guilty of the more serious crime of murder." (*Lasko, supra,* 23 Cal.4th at p. 113.)

We likewise conclude that in this case defendant was not prejudiced by the erroneous instruction.  First, when the entirety of the charge is considered, it does not support defendant's assertion that if the jurors somehow managed to conclude that he acted in the heat of passion without an intent to kill, then they had to find him guilty of the more serious crime of murder.  Just as in *Lasko, supra,* 23 Cal.4th 101, the jury was given CALJIC No. 8.50 and therefore knew that it could not convict defendant of murder unless it found that the People had satisfied its burden of proving beyond a reasonable doubt that the death did not occur in the heat of passion or upon a sudden quarrel.  Thus, just as in *Lasko,* if the jurors believed defendant had acted in the heat of passion without an intent to kill, they "most likely would have convicted [him] of involuntary manslaughter, a lesser offense included within the crime of murder, on which the jury was also instructed.  Instead, the jury convicted defendant of second degree murder, showing it did not believe the killing was committed in the heat of passion." (*Id.* at p. 112.)  Second, neither side strongly argued for a voluntary manslaughter verdict.  During closing arguments, the prosecutor only briefly mentioned manslaughter; the People's arguments were focused on the various theories supporting a second degree murder verdict.

[Footnote 11.  The portion of the closing argument quoted by defendant in his opening brief in support of his assertion that the People had urged the jury to return a voluntary manslaughter verdict was taken out of context; actually, in this portion of the closing argument the prosecutor was arguing that defendant should be found guilty of second degree murder under an implied malice theory.]

The defense theory (that after defendant went to work, Genna left the house and was murdered by an unknown assailant) is inconsistent with all verdicts except an acquittal. Notably, defense counsel did not argue as a fallback position that if the jury concluded that defendant had killed Genna, then he did so during a sudden quarrel or in the heat of passion. Third, while defendant's comments to some neighbors on Sunday morning that he had argued with Genna about her chores provide some minimal support for the trial court's decision to instruct on manslaughter, the record does not contain any significant evidence of legally sufficient provocation or proof that the killing occurred in the midst of a sudden quarrel. Here, just as in *People v. Lee* (1999) 20 Cal.4th 47 (*Lee*), "[t]here was no direct evidence that [the victim] did or said anything sufficiently provocative that her conduct would cause an average person to react with deadly passion. Nor was there direct evidence that defendant acted under the influence of such passion." (*Id*. at p. 59.) There also was no evidence showing that the killing occurred in the midst of "mutual combat" and that defendant had not taken "undue advantage" of Genna. Therefore, the "sudden quarrel" form of voluntary manslaughter is not implicated here. (*Id*. at p. 60, fn. 6.) Finally, we agree with the Attorney General that the evidence strongly suggests that defendant possessed an intent to kill. Dr. Lawrence testified that there were two separate applications of a ligature and that in order to kill Genna in this manner defendant had to maintain pressure for approximately five minutes after she lost consciousness. For all these reasons, we find the misinstruction to be harmless under state law and also conclude that it did not result in infringement of defendant's constitutional guarantees. (*Lasko*, *supra*, 23 Cal.4th at pp. 111-113.)

Petitioner now repeats his arguments made to the Court of Appeal, claiming that a finding of unintentional murder was a possibility in this case. This court finds that as set forth above, the Court of Appeal carefully addressed and rejected this claim, and that Petitioner cannot carry his burden of demonstrating that the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d). Accordingly, the court finds that this claim presents no basis for habeas corpus relief.

III. Jury Questions During Deliberations

Petitioner contends that the trial court's failure to inform defense counsel of a question from the jurors during their deliberations, and its response to that question in the absence of defense counsel, deprived Petitioner of his right to effective assistance of counsel. Respondent disputes this contention.

The Court of Appeal explained the factual background as follows:

During presentation of the People's case-in-chief, it was decided that the jury would be permitted to view the exterior of the house, the turnout and the ravine. Prior to the jury visit,

one of the jurors asked the court if they could take their notebooks with them.  The court asked counsel if there was any objection to notebooks at the scene; defense counsel responded that he did not object.  Another juror asked if they were going to go up or down any steep embankments.  The court replied that it did not think that they would do so.

The jury was taken by bus to the house.  The jurors observed the outside of the house while seated in the bus.  They were then driven to the turnout.  Defense counsel and defendant were present with the judge, bailiff and jurors.  The jurors exited the bus.  The court pointed out the two trails down the ravine and note where the body had been found.  The jurors approached the top of the trails and looked down but they did not walk down into the ravine.  They all walked on Tim Bell Road, crossed the bridge over Dry Creek, and looked back directly across the creek.

During jury deliberations, the jury sent out a note requesting a second visit to the turnout and ravine (the second view).  The court held a conference concerning the jury's request during the afternoon of October 15, 1999.  The prosecutor appeared personally; defense counsel appeared telephonically and defendant was excused.  "The People immediately indicated they wanted no more trips to the scene. [Defense counsel] was in favor of allowing the jury to revisit the scene so long as no attorneys would be present. [Citation] The People requested additional time to consider the request and also requested that the defendant be personally present."  The court ordered the parties to appear for further conference the following morning.

Further hearing was held on October 16.  The prosecutor and defendant personally appeared.  Defense counsel appeared telephonically because he was ill.  Defense counsel immediately stated that he had no objection to the second visit.  He stated that defendant and he would not be present at the second view.  The People's "only concern." was to make it "clear on the record" that defense counsel and defendant were waiving their presence at the second view.  The court decided to grant the jury's request, finding that "no one is requesting to be present and everyone is waiving their right to be present."

Then, the court told the parties that the jury had sent out another note asking if they would be permitted to "go down the hill to the lower scene where the body was found and/or can something be placed to mark the spot where Genna was found?"  Before the court could complete its comments, defense counsel interrupted and said," Well, I think if they want to go down to the lower scene, they should go down to the lower scene."  The prosecutor and the court both stated that they were concerned someone could get hurt attempting to renegotiate the steep slope.  Defense counsel responded, "It's neither of our concerns whether they get hurt or not.  If that's what they want to do, then that's what they have the right to do.  If we're going to allow them to go to the scene, we can't restrict them from going to the scene . . . .[¶] . . .[¶] But you can't send them out there and then say, 'No, you can't go down there.'"  The prosecutor then asked the court whether "there's a rope that's available in case they have trouble getting up."  The court responded that it was "going to suggest . . . that they take kind of a roundabout way down rather than going straight down."  The prosecutor pointed out that there was "that other route down which is not quite so steep."  The court asked defense counsel, "Any problems with that?"  Defense counsel answered that he did not "care how they get down," reiterating that the jurors must "have free choice in going down, that's all.  Whether they want to go down or not go down is up to each individual."  The court decided that it would "tell them they may go down if they choose."  It then stated that it would reread CAJIC No. 1.12 to the jurors, informing them not to say or do anything that could be construed as discussions or deliberations during the second view.  The court stated that it would reconvene with the jury present.  The jurors would be informed of its decision and instructed.  Defense counsel waived his presence in the courtroom.  The court asked defendant whether he wised to be present and defendant replied affirmatively.

When the court reconvened, it informed the jurors that their requests were granted and they were given the admonishments discussed above.  A juror asked whether "we can take our notebooks and jot down mental notes to ourselves so we can talk about it when we get back to the jury room[?]"  The court immediately replied that the jurors could take their notebooks with them, as follows: "[N]o deliberations at the scene, but taking your own notes

is no problem, all the same admonitions I've given you on notetaking."

The settled statement prepared by the trial court described the second jury visit as follows: "At the scene, a few of the jurors descended the hill, but most stayed at the top. No notation was made as to which jurors descended. All jurors were within sight of the bailiff at all times. No jurors conducted any experiments or demonstrations, took any measurements, moved any items, or did anything else prohibited by the court. Nobody arrived or was present at the scene at any time during the visit other than the [judge, bailiff, and court clerk]. There were no significant observable differences in the scene on the second visit as compared to the first. . . .   [¶] Jurors' notes were collected at the end of the trial and disposed of by the court to preserve their privacy."

Petitioner now contends that both state law and the Sixth Amendment required that defense counsel be informed of any question from deliberating jurors and be consulted concerning the court's intended response. He argues that defense counsel did not and could not have waived Petitioner's right to be consulted as to any request or question raised in the court by the jury.  He characterizes the jury's inquiry regarding notetaking during the second view as "essentially asking if jurors could take evidence at the scene in addition to that admitted at trial," describing this as a critical stage of the trial at which defense counsel's presence was required by the Sixth Amendment.  Petitioner concludes that the trial court's failure to inform defense counsel of and failure to consult with counsel concerning the court's response to the jury's question therefore constituted both statutory and Constitutional error.  Finally, he asserts that the error cannot be proven harmless beyond a reasonable doubt because it may have permitted the taking of new evidence and the state courts denied an evidentiary hearing on the issue.

In addressing this issue, the Court of Appeal held as follows:

Defendant challenges the legal propriety of the second view.  He contends that by granting the jury's requests, the court erroneously allowed new evidence to be received while the jury was deliberating in violation of his statutory and constitutional rights.  Defendant reasons that the jurors who descended the ravine would have viewed the crime scene from a different angle than they had view it during the first visit, thereby receiving new visual observations, and they could have conveyed these new sensory observations to the rest of the jury.  He also cites the fact that the jurors were permitted to take notes during the second visit as demonstrative of their receipt of new evidence.  The Attorney General replies that the second view "amounted only to their reconsideration, during the deliberative process, of evidence already before them."  We agree with the Attorney General.  As will be explained below, the trial court's decision to accede to defense counsel's forceful arguments that it should grant both of the jury's requests did not result in receipt of new evidence during deliberations or improper experimentation by the jury.

In California, a jury is deemed to be receiving evidence when it visits a crime scene or other location for the first time. [Citations omitted.] While it is not common for a deliberating jury to request to visit a crime scene or other place, it is not unheard of either; thus, it is well-established that the decision whether or not to grant such a request si a matter of judicial discretion. [Citations omitted.]

1        Yet, this case presents an unusual twist.  Unlike the cases cited above, the deliberating
jury in the present case did not ask to visit a previously unseen location.  Rather, the jury
2   sought a second visit to a location it saw during the People's case-in-chief and "[t]here were
no significant observable differences in the scene on the second visit as compared with the
3   first."  Thus, the relevant determination is whether a deliberating jury is receiving new
evidence when it *revisits* a fundamentally unchanged crime scene during its deliberations, or
4   whether it is merely refreshing its recollection of previously admitted evidence.

5        The Court of Appeal acknowledged that this appeared to be an issue of first impression in

6   California.  Noting that Section 119 authorizes jury visits and Section 1138 "gives a deliberating jury

7   the right to rehear evidence and instruction on request," People v. Gurule, 28 Cal.4th 557, 649

8   (2002), the Court of Appeal stated that neither party cited a case considering the propriety of a

9   second jury visit to a crime scene during deliberations.  The court discussed Bradford v. State, 675

10  N.E.2d 296 (Ind. 1996), finding it to be instructive.  In that case, the court treated the jury's request

11  for a second visit to the crime scene as equivalent to a request that testimony be reread or a videotape

12  be viewed a second time.  The court focused primarily on the jurors' actions at the crime scene.  The

13  Court of Appeal found this approach sound and adopted it.  The Court of Appeal therefore concluded

14  that the trial court's decision to allow a second visit to the turnout and ravine was not per se

15  erroneous and did not result in the receipt of new evidence during deliberations.

16       The Court of Appeal also rejected the claim that the court permitted the jurors to receive new

17  evidence or conduct improper experiments when it allowed them to descend into the ravine.  In

18  doing so, the Court of Appeal relied upon a long line of California cases establishing that close

19  observation and even physical manipulation of evidentiary exhibits during deliberations is not

20  prohibited.  See People v. Turner, 22 Cal.App.3d 174 (1971); People v. Bogle, 41 Cal.App.4th 770

21  (1995).  The Court of Appeal concluded that the few jurors who walked down the ravine were

22  assessing evidence that had been presented during the trial and not invading a new field that had not

23  been presented at trial.   It also concluded there was no basis for Petitioner's reliance on the fact that

24  jurors may have taken notes during the second jury visit as proof they received new evidence.  It is

25  well-established California law that notes are an aid to a juror's memory and are not new evidence.

26  People v. Whitt, 36 Cal.3d 724, 746-747.

27       In light of all of the above, the Court of Appeal concluded that the trial court did not abuse its

28  discretion by acceding to defense counsel's position that it should grant both of the jury's requests.

1    It found that the jurors did not receive new evidence during deliberations and did not engage in

2    improper experimentation.  Thus, it concluded that neither Petitioner's Constitutional rights nor his

3    statutory protections were violated.

4        Finally, in regard to the trial court's response to the jury's question about notetaking during

5    the second viewing, the Court of Appeal held as follows:

6        Defendant claims that the trial court's unilateral decision to allow the jurors to take notes
     "undermined the court's earlier admonition against investigation," and invalidated defense

7    counsel's attendance waiver because it was a "change in the ground rules for the second
     visit."  Even if we were to accept defendant's assertion that the trial court was obliged to

8    inform defense counsel of the jury's question about notetaking before responding (despite
     defense counsel's attendance waiver at the proceeding where the question was posed) and

9    also conclude that the contention is cognizable (despite the absence of an objection on this
     ground prior to entry of the verdict), this argument fails because defendant has not

10   established prejudice, even when the error is assessed under the most stringent "harmless
     beyond a reasonable doubt" standard.  (*Roberts,supra*, 2 Cal.4th at p. 326 [failure to record

11   responses to three questions in open court in the parties' presence harmless error];
     *Hawthorne, supra*, 4 Cal.4th at pp. 67-71 [failure to notify counsel of juror's question

12   harmless error]; *People v. Neufer, supra*, 30 Cal.App.4th at pp. 251-253 [same].) [Footnote
     omitted.] The absence of prejudice also demonstrates that the alleged error is not of such

13   magnitude that it impacted defendant's right to representation by counsel or his "Eighth
     Amendment right to reliability in the fact-finding process."  (*Roberts, supra*, 2 Cal.4th at p.

14   326.)
         First, the jury's inquiry did not relate to a substantive legal matter.  This was a simple

15   procedural inquiry, the answer to which was encompassed within the trial court's inherent
     authority to control the trial.  Notes are simply a memory aid and allowing the jury to take

16   notes during the second view did not encourage improper experimentation or lead to the
     receipt of new evidence during deliberations.  The trial court did not provide the jury with

17   instruction relating to an element of an offense or to an affirmative defense.  Second,
     permitting the jurors to take notes at the second view did not "change the ground rules."  It is

18   not reasonably probable that defense counsel would have erroneously assumed that the jury
     would be prohibited from taking notes at the second view when he waived attendance at the

19   instructional proceeding and at the jury view.  Third, defendant was present and had actual
     notice of the jury's question and the court's answer.  Fourth, it is not reasonably probable that

20   defense counsel would have argued that notetaking should be prohibited if he had been
     notified of the jury's inquiry.  Defense counsel had affirmatively declared that he did not

21   object to notetaking during the first jury visit.  Defense counsel had just argued that the jury
     should be granted substantial leeway during the second view and asserted that the jurors had

22   a "right" to do what they wanted during the second view.  It would have been illogical for
     counsel to suddenly reverse course and demand that the court prohibit notetaking during the

23   second view when the jurors might be jotting down something that could result in
     defendant's acquittal. There is no strategic advantage resulting from a refusal to permit

24   notetaking during the second view and defendant does not suggest any possible gain he
     would have received  by such a prohibition.  Fifth, it is not reasonably possible that the

25   court's affirmative answer to the jury's inquiry about notetaking would have impacted
     defense counsel's assessment of the desirability of the second view or his decision to enter an

26   attendance waiver.  As discussed previously, the presence of defendant and his counsel at the
     second view would not have assisted the defense.  If defense counsel had been interested in

27   observing the jury's demeanor and conduct during the second view he would not have
     immediately waived his attendance.  Accordingly, whether the trial court's failure to notify

28   defense counsel of the jury's question about notetaking is considered in a statutory or

constitutional context, defendant's claim of prejudicial error fails.  (*Roberts, supra*, 2 Cal.4th at p. 326; *Hawthorne, supra*, 4 Cal.4th at pp. 67-71; *People v. Neufer, supra*, 30 Cal.App.4th at pp. 251 - 253.)

After reviewing Petitioner's arguments, this court finds that Petitioner cannot carry his burden of demonstrating that the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d).  In particular, this court finds Petitioner cannot carry his burden in regard to the premise of his entire argument, i.e., that notetaking by the jury during the second viewing amounted to prejudicial error.  The extensive discussion by the Court of Appeal amply demonstrates that even if error occurred, it was not prejudicial.  The court finds, therefore, that this claim presents no basis for habeas corpus relief.

IV.  Acceptance of Waiver of Attendance at Second Jury Visit

Petitioner claims that the trial court's acceptance of defense counsel's  waiver of Petitioner's presence during the second jury visit to the crime scene violated his constitutional and statutory rights.  Petitioner's claim is based on two premises: 1) that evidence was received during the second jury view, and 2) that the Sixth Amendment's guarantee of personal presence at all trial proceedings gave him the right to be present at the second jury view.  The Court of Appeal found both premises to be incorrect.  As discussed above, the Court of Appeal found that under the facts of this case, the jury did not receive new evidence during the second view.  Second, the Court of Appeal found that there is no federal constitutional right to be present at a jury view.  See Snyder v. Massachusetts, 291 U.S. at 107-08 (1934) (federal constitution does not guarantee a criminal defendant the right to be present during a jury view of the crime scene).

In arguing that Petitioner's constitutional rights were infringed because the court allowed the second jury view,  Petitioner relies on People v. Garcia, 4 Cal.4th at 802-803. In that case, the California Supreme Court found that a defendant and his counsel have the right to be present at a second jury viewing of a crime scene after deliberations begin.  Petitioner's reliance on the case is

1   misplaced, however, because   the California Supreme Court based its decision on "the provisions

2   and purposes underlying section 1138, and the California authorities that have applied this statutory

3   provision." Further, the case does not address the issue of waiver, such as occurred here.  While

4   Petitioner argues that counsel's  waiver of his presence was invalid, he bases this on his claim that

5   the jury received new evidence was received.  As discussed above, this claim has been rejected by

6   both the Court of Appeal and this court.  Further, it is established federal law that a defendant may

7   waive his right to be present at critical stages of the proceedings.  See Campbell v. Wood, 18 F.3d

8   662, 671 (9th Cir. 1994).

9        This court finds, therefore, that Petitioner cannot carry his burden of demonstrating that the

10  state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an

11  unreasonable application of, clearly established Federal law, as determined by the Supreme Court of

12  the United States;" or "resulted in a decision that was based on an unreasonable determination of the

13  facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d).  This

14  claim therefore presents no basis for federal habeas corpus relief.

15       Based on the foregoing, IT IS HEREBY RECOMMENDED as follows:

16  1)     that this petition for writ of habeas corpus be DENIED;

17  2)     that the Clerk of the Court be directed to ENTER  judgment for Respondent and to close this

18         case.

19

20       These Findings and Recommendation are submitted to the assigned United States District

21  Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the

22  Local Rules of Practice for the United States District Court, Eastern District of California.  Within

23  thirty (30) days after being served with a copy, any party may file written objections with the court

24  and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate

25  Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within

26  ten (10) court days (plus three days if served by mail) after service of the objections.  The court will

27  then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are

28  advised that failure to file objections within the specified time may waive the right to appeal the

1  District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

2

3

4  IT IS SO ORDERED.

5  **Dated:    May 28, 2008**                           _____/s/  **William M. Wunderlich**_____
                                                        UNITED STATES MAGISTRATE JUDGE
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28